NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.M.

No. 1 CA-JV 25-0138
FILED 03-06-2026

---

Appeal from the Superior Court in Maricopa County
No. JD534803
The Honorable Suzanne E. Cohen, Judge

**VACATED AND REMANDED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Father*

Arizona Attorney General's Office, Phoenix
By Anna V. Vaszar
*Counsel for Appellee Department of Child Safety*

Deanna Sandler, Esq., Scottsdale
By Deanna Sandler
*Counsel for Child*

_____

**MEMORANDUM DECISION**

Vice Chief Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge Veronika Fabian joined.

_____

**W E I N Z W E I G**, Vice Chief Judge:

¶1         James M. ("Father") appeals the superior court's order terminating his parental rights to his child, M.M. ("Child"). Because the Department of Child Safety ("DCS") did not offer reasonable reunification efforts, we vacate and remand for further proceedings.

**FACTS AND PROCEDURAL BACKGROUND**

¶2         Father is the biological parent of Child, born in September 2024.[1] Child was born substance exposed to methamphetamine, amphetamines, THC and methadone. DCS removed Child and the superior court found her dependent. Child was released from the hospital to her current foster placement.

¶3         When Child was removed, Father was three months into a 4.5-year prison sentence for possession of dangerous drugs and drug paraphernalia, along with misconduct involving weapons. He was originally jailed in a facility about an hour's drive from Child's foster placement, but was moved in June 2025 to a facility three hours away. While in prison, Father remained sober and participated in drug-treatment and parenting classes.

¶4         DCS contacted Father after Child was removed and offered him paternity testing. In December 2024, DCS learned that Father was the Child's natural parent.

¶5         Father wanted in-person visits. He later testified he "told everybody I wanted in-person visits." DCS denied in-person visits because it believed Father was jailed too far away and prison was not a suitable place for an infant. DCS did, however, begin twice-weekly virtual visits

_____

[1]     Mother's parental rights were terminated, but she is not a party to this appeal.

between Child and Father. These visits went well—Child appeared happy and Father acted appropriately.

**¶6** Father did more than ask for visitation. He tried to have Child placed with his fiancée. He filed a guardianship petition so that his fiancée could care for Child until he is released. His fiancée was approved as a placement after a home study, but DCS elected to keep Child with her current placement over concerns his fiancée did not understand the gravity of Father's substance abuse and misconduct.

**¶7** DCS moved to terminate Father's parental rights in May 2025 on the statutory ground of length of felony incarceration. The case was tried in August 2025. The court heard testimony from the DCS case manager, Father and his fiancée.

**¶8** The case manager testified that DCS offered only one reunification service to incarcerated parents—visitation. She testified that prisoners cannot bond with infants because an infant needs physical interaction. Father was denied in-person visits because of the distance between Child and Father's prison, and DCS believed that prison was inappropriate for an infant. Father's fiancée testified she wanted to take care of Child, would treat her like her own child and was open to guardianship or adoption.

**¶9** The superior court terminated Father's parental rights. The court found DCS made reasonable and diligent efforts to reunify Father and Child. It weighed the *Michael J.* factors and found Child would be deprived of a normal home for a period of years because of Father's felony incarceration. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251–52, ¶ 29 (2000). And it found that termination was in Child's best interests because Child will be adopted by her current placement, where she had a loving and nurturing home. The court denied the guardianship petition because Child never lived with Father's fiancée.

**¶10** Father timely appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 8-235(A), 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

**¶11** Father challenges the superior court's termination of his parental rights. We will affirm a termination order unless clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We accept the court's findings of fact unless no reasonable evidence supports them, *id.*, and view the evidence in the light most favorable to

upholding the order, *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 97, ¶ 20 (App. 2009).

**¶12** Parents enjoy a fundamental liberty interest in the care and custody of their children, along with a due process right to "fair procedures" when that interest is challenged. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). As a result, the State must make "reasonable efforts to preserve the family" before it can terminate parental rights. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). Reasonable efforts means "measures with a reasonable prospect of success," but not efforts that would be futile or endanger the child. *Id.* at 192, ¶ 34; *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582, ¶ 21 (2021).

**¶13** Father argues that DCS did not make reasonable efforts to preserve the family here. DCS counters that Father waived this argument because he did not timely object to the adequacy of services. Not so. Father requested DCS provide in-person visits; and he challenged the adequacy of services during the severance trial, preserving the issue for appeal. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178, ¶¶ 13–14 (App. 2014) ("And, at a termination hearing, a parent can dispute evidence that [DCS] claims shows a diligent effort to provide appropriate reunification services.").

**¶14** DCS must make reasonable efforts to preserve the family even when a parent is incarcerated. *Jessie D.*, 251 Ariz. at 582, ¶ 21. "Because parents incarcerated for a lengthy period still possess a fundamental liberty interest in the care, custody, and management of their children, DCS must make diligent efforts to preserve the family by providing services to assist parents in maintaining a bond with their children." *Id.* at 581–82, ¶ 20 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)) (citation modified).

**¶15** An incarcerated parent cannot have his parental rights terminated just because he cannot interact with the children in a more traditional setting. *Id.* at 581, ¶ 16. If parental rights could be terminated for that reason, "incarcerated parents could never adequately maintain a parent-child relationship with their young children," which is "contrary to law." *Id.* at ¶ 17. The superior court must instead focus on "'how and whether' a parental relationship can be maintained during [the parent's] incarceration." *Id.* at ¶ 16.

**¶16** DCS must "initiate measures designed to address an incarcerated parent's desire to maintain a parent-child relationship." *Id.* at 582, ¶ 21. "[M]aintaining a relationship with one's children while

incarcerated would undoubtedly be a difficult task, but an incarcerated parent can maintain a bond with a child in other ways, such as through visits, phone calls, letters, pictures, and gifts." *Id.* at 581, ¶ 17.

¶17 The superior court found that DCS made reasonable efforts to reunify the family here by arranging twice-weekly virtual visits. That was error. The DCS case manager testified that Father could not establish or maintain a relationship with Child through virtual visits alone because in-person visits are essential:

> [Child] is in [the] primitive years of her development, where her primary bonding comes from physical touch, face-to-face interactions, and learning to trust the caregivers in her life, all of which are things that she is not able to do with her father, given his incarceration status.

And yet, Father was denied in-person visitation:

> Q      Would in-person visits with Father have been possible to set up for [Child]?
>
> A      Not realistically, no.
>
> Q      Why do you say not realistically?
>
> A      First, the environment where the visits would take place in a prison is not appropriate for a newborn. And in addition to that, Father is incarcerated several hours away from where the child is, so to try to facilitate in-person visits regularly would be contrary to the best interest of the child.

¶18 Father had no chance to establish or preserve the parent-child relationship under that logic. DCS's own witness confirmed that virtual visits were insufficient for an infant's bonding needs, but that is all Father received. Against that backdrop, virtual visits did not represent reasonable efforts to preserve the family; they were a setup for failure.

¶19 The superior court did not find that in-person visitation would be futile or endanger the child. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 34; *Jessie D.*, 251 Ariz. at 582, ¶ 21. And though the case manager testified it was inappropriate for Child to visit a prison located "several hours away," DCS also denied in-person visits when Father was incarcerated just an hour from Child.

¶20 Nor can DCS fault Father for not seizing on the services it offered. By all accounts, Father participated to the best of his abilities. He consistently attended the virtual visits and even arranged make-up visits to account for Child's foster placement traveling to Europe for a month. He positively engaged with Child and acted appropriately during the visits. What is more, he self-enrolled in parenting and drug treatment classes offered by the prison.

¶21 Because DCS offered only services that had no prospect of success, the superior court erred in finding DCS made reasonable efforts to reunify the family. *See Mary Ellen C.*, 193 Ariz. at 186-87, ¶ 1. Because we reverse the court's order terminating Father's parental rights, we need not reach Father's remaining arguments.

## CONCLUSION

¶22 We vacate the superior court's order terminating Father's parental rights and remand for further proceedings consistent with this decision.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:          JR